UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
                                    :
UNITED STATES OF AMERICA            :
                                    :      <u>INFORMATION</u>
        -v-                         :
                                    :      07 Cr.
SANTO C. MAGGIO,                    :
                                    :
                Defendant.          :
                                    :
------------------------------------x


<u>COUNT ONE</u>

**(Conspiracy To Commit Securities Fraud, Wire Fraud, To Make
False Filings With The SEC, To Make Material Misstatements To
Auditors, Bank Fraud and Money Laundering)**

The United States Attorney charges:

<u>RELEVANT ENTITIES AND PERSONS</u>

1.  At certain times relevant to this Information,
Refco, Inc. was a Delaware corporation with its principal place
of business in New York, New York.  From at least the mid-1990s,
the business of Refco, Inc. and its predecessor entities included
providing execution and clearing services for exchange-traded
derivatives and providing prime brokerage services in the fixed
income and foreign exchange markets.  Refco, Inc. held its
initial public offering of common stock on or about August 10,
2005.  Prior to on or about August 10, 2005, Refco, Inc.'s
predecessor entities were privately held.  Refco, Inc. and its
predecessor entities are referred to herein collectively as
"Refco."

2.  At all times relevant to this Information, Phillip

R. Bennett, a coconspirator not named as a defendant herein, was
the President and Chief Executive Officer of Refco.  At all times
relevant to this Information, Bennett had a substantial ownership
interest in Refco, directly and indirectly.

    3.    At certain times relevant to this Information,
Robert C. Trosten, a coconspirator not named as a defendant
herein, held senior management positions at Refco.  Among other
positions, Trosten was Chief Financial Officer of Refco, a
position he held from in or about May 2001 until in or about
August 2004, when he left the company.

    4.    At certain times relevant to this Information,
Tone N. Grant, a coconspirator not named as a defendant herein,
held a senior management position at Refco.  From at least in or
about 1997 through in or about June 1998, Grant was the President
of Refco.  At certain times relevant to this Information, Grant
indirectly held a significant ownership interest in Refco.

    5.    At certain times relevant to this Information,
SANTO C. MAGGIO, the defendant, held senior management positions
at Refco.  Among other positions, MAGGIO was an Executive Vice
President of Refco, and the President and Chief Executive Officer
of Refco Securities LLC, a wholly owned subsidiary of Refco.

    6.    At all times relevant to this Information, Bank
Für Arbeit Und Wirtschaft Und Österreichische Postparkasse
Aktiengesellschaft,("BAWAG"), was the fourth largest bank in

Austria. BAWAG was owned at various times by, among other entities, the Austrian Trade Unions Association, formally known as Österreichischer Gewerkschaftsbund (ÖGB). At various times relevant to this Information, BAWAG indirectly held a substantial ownership interest in Refco.

7. At all times relevant to this Information, Refco Group Holdings, Inc. ("RGHI") was a privately-held Delaware corporation that held a substantial ownership interest in Refco. At various times relevant to this Information, RGHI was owned in whole or in part by Phillip R. Bennett and Tone N. Grant.

### THE SCHEME TO DEFRAUD

8. From at least as early as in or about the late 1990s, SANTO C. MAGGIO, the defendant, at the direction of Phillip R. Bennett and together with others known and unknown, schemed to hide the true financial health of Refco from its banks, counterparties, auditors, and investors. Starting at least as early as the late 1990s, Bennett, MAGGIO, and their coconspirators embarked on a strategy to mask the true performance of Refco's business in order to sell the company for Bennett and MAGGIO's own benefit and that of Refco's owners other than Bennett. To that end, over the ensuing years, Bennett, MAGGIO, and others known and unknown systematically (1) covered up both Refco's own losses and customer losses for which Refco became responsible; (2) moved Refco operating expenses off the

3

company's books; and (3) padded Refco's revenues, all in an effort to mislead Refco's banks, counterparties, auditors and investors, with the goals of keeping Refco in business and then selling it for the maximum benefit to its owners and senior management.

9.    In furtherance of this scheme, Phillip R. Bennett, SANTO C. MAGGIO, and others known and unknown made and caused Refco and others on its behalf to make false and fraudulent statements to Refco's banks, counterparties, customers, auditors, and investors, and to create false audited financial statements and false public filings with the United States Securities and Exchange Commission ("SEC").  The scheme included obtaining, through fraud, the following:  lines of credit for Refco; the private sale of notes prior to 2004; the sale of 57 per cent of Refco to a group headed by Thomas H. Lee Partners in 2004; the sale of approximately $600 million of notes to the public in 2004; approximately $800 million of bank financing obtained in 2004; and the August 2005 initial public offering of stock ("IPO") in Refco, Inc., in which the public purchased approximately $583 million of Refco common stock based on a false and fraudulent registration statement.

### Early Origins Of Refco's Financial Problems

10.    In or about the mid-1990s, Refco was wholly owned by RGHI, which in turn was owned by Phillip R. Bennett, Tone N.

Grant and one other partner.  As of early 1997, RGHI owed Refco at least approximately $106 million.  Starting later in 1997, Refco directly and indirectly incurred a series of substantial trading losses that threatened the continued viability of Refco's business.  In response to these losses, at various times between in or about May 1997 and in or about October 2005, Bennett, and later, SANTO C. MAGGIO and their coconspirators, moved losses and expenses out of Refco and into RGHI, and artificially padded Refco's revenues at the expense of RGHI, in an effort to hide Refco's true liabilities, manipulate its reported earnings, and thereby seek to defraud a purchaser into buying the firm at a price that would pay off the accumulated debt and ensure a profit to Refco's owners.  This strategy resulted in an enormous increase in the already large debt from RGHI to Refco that eventually totaled more than $1 billion (the "RGHI receivable"). The debt by RGHI to Refco, carried on Refco's books as a receivable from RGHI, was over time comprised of, among other things, the following principal components: (a) liabilities incurred by Refco when brokerage customers to whom it had extended credit defaulted on their obligations, which were later transferred to RGHI; (b) Refco's proprietary trading losses; (c) various operating expenses incurred by Refco and paid in the first instance by Refco but later transferred to RGHI as an increase in RGHI's debt to Refco; and (d) transactions designed

to pad Refco's revenues in which the benefits accrued to Refco and the associated costs were incurred by RGHI.

### Historical Losses

11.    As a commodities, securities, and futures brokerage and clearing firm, Refco extended credit to customers, allowing customers to make securities, commodities, and futures trades in accounts held at Refco.  In the later 1990s, certain Refco customers to whom Refco had extended credit sustained hundreds of millions of dollars of trading losses in their accounts at Refco.  When the customers were unable to make payments on the credit Refco had extended, Refco liquidated certain of the positions and assumed the resulting losses in the customers' accounts.  Refco sustained large losses of this type, among other times, in 1997, totaling at least approximately $225 million.  These customer losses included the following:

### Asian Debt Crisis Customers

12.    In or about May 1997, a group of Refco customers to whom Refco had extended credit for the purpose of investing in Asian markets sustained large losses in connection with the Asian debt crisis.  When those customers were unable to cover their losses, Refco paid the losses, using hundreds of millions of dollars of customer funds within the unregulated segments of its business.  By the end of May 1997, these losses totaled more than $310 million, and, at the end of December 1997, based on changed

market conditions, they totaled approximately $185 million.

### Customer 1

13.   In or about October 1997, a Refco customer to whom Refco had extended credit ("Customer 1"), lost more than $90 million in a series of transactions carried out on the Chicago Mercantile Exchange ("CME"). When Customer 1 could not cover his margin requirements, Refco was forced to meet the margin call from the CME, using the proceeds of a short-term loan from a financial institution of at least approximately $90 million to meet its margin requirements, and then using customer funds taken from the unregulated segments of Refco's business to repay the loan.

14.   Recognizing that public acknowledgment of a loss of more than $90 million would threaten Refco's continued existence, Phillip R. Bennett, Tone N. Grant, SANTO C. MAGGIO, and others known and unknown falsely represented to the public and other customers that Refco had not sustained a significant loss as a result of Customer 1's losses. In addition, Bennett and others significantly misrepresented the size of the loss to Refco's auditors.

15.   Philip R. Bennett, SANTO C. MAGGIO, and others, having misrepresented to third parties that Refco had not suffered a significant loss as a result of Customer 1's trading activity, caused at least $71 million of debt owed by Customer 1

from the trading losses to be transferred to become a debt from RGHI to Refco.

### Refco Expenses Moved To RGHI

16.  Beginning at least as early as 1999, Phillip R. Bennett and others schemed to reduce Refco's expenses (therefore falsely increasing Refco's apparent profitability) by moving Refco expenses off of Refco's books and onto the books of RGHI.

17.  The result of these actions by Phillip R. Bennett, SANTO C. MAGGIO, and their coconspirators was to contribute to the large and growing debt owed by RGHI to Refco.  By in or about February 1999, RGHI owed Refco at least approximately $252 million.  In addition, as of in or about February 1999, at least approximately $156 million of customer losses for which Refco was responsible were held in accounts within Refco Global Finance, a consolidating Refco subsidiary.  Thus, a total of at least approximately $409 million in customer losses, Refco losses, and other expenses, principally from the sources outlined above, had accumulated by February 1999.

### Refco's Losses Funded By Use Of Customer Funds

18.  Starting at least in or about 1997, Phillip R. Bennett, SANTO C. MAGGIO, and their coconspirators caused Refco to use customer funds to cover its losses.  As a result, Refco was perpetually short of cash, and was often unable to cover settlement of its customers' transactions.  Accordingly, Bennett,

MAGGIO, and others caused Refco systematically to fail to meet settlement on its customer transactions, often on a daily basis, in amounts that exceeded, at times, approximately $100 million a day.  Bennett, MAGGIO, and others then caused Refco to repeatedly misrepresent to the financial institutions to whom Refco owed money to settle Refco's customers' transactions that its failure to make settlement was an error, when in fact Refco purposefully selected, on a rotating basis, institutions with whom it would fail to make settlement, and attempted to stagger its failures to make settlement with each institution so as not to arouse suspicion from the institutions that Refco was in fact unable to fulfill its daily settlement obligations.

### BAWAG Invests In Refco

19.  By the end of 1998, Refco was in a precarious financial condition, in light of the significant customer and proprietary trading losses it had absorbed and the resulting daily failure to make settlement on customer transactions.  In order to address that problem, in or about late 1998, Bennett sought a capital contribution from BAWAG.  In a transaction that closed in 1999, BAWAG, through an affiliate, purchased a ten percent ownership interest in Refco for approximately $95 million, and lent Refco approximately $85 million of additional capital in return for an option to purchase an additional ten percent of Refco.

## Hiding The RGHI Receivable

20.  Throughout the period covered by this Information, Refco's books were audited by independent auditors on an annual basis, with a fiscal year-end on the last day of February.  Among the items the auditors examined each year were "related party transactions," and, in particular, transactions between and among Refco and members of Refco's management, including Phillip R. Bennett.  Refco and RGHI were related parties.

21.  Beginning at least as early as February 1998, Phillip R. Bennett and SANTO C. MAGGIO, among others, directed others known and unknown to hide the size of the huge and growing RGHI receivable from, among others, Refco's auditors, by carrying out a series of transactions in order temporarily to pay down all or part of the RGHI receivable over Refco's fiscal year-end and replace it with a receivable from one or more other entities not related to Bennett or Refco.  At certain times, Bennett also caused the Asian Debt Crisis Customer Losses, which were held in an account at Refco Global Finance, a consolidating entity within Refco, to temporarily be transferred out of Refco to RGHI and then, together with the rest of the RGHI receivable, transferred to one or more third parties not affiliated with Refco over its fiscal year-end.  Bennett and, later, MAGGIO and others, caused the reduction of all or part of the RGHI receivable in this manner at every fiscal year-end from at least the fiscal year-end

on February 28, 1998 through the fiscal year-end on February 29, 2004. Bennett, MAGGIO and others directed these transactions in order to hide the existence of the related party receivable and the underlying causes of its existence from Refco's auditors, banks, investors, and others.

22. In 1998 and 1999, Phillip R. Bennett, SANTO C. MAGGIO and others, carried out year-end cover-up transactions in a manner similar to that described below, in the following approximate amounts:

| Date | Approximate Customer Loans |
|---|---|
| February 1998 | $175 million |
| February 1999 | $265 million |

23. Beginning in 2000, Phillip R. Bennett and SANTO C. MAGGIO's year-end, and starting in 2004, quarter-end cover-up transactions were of two types: transactions with Refco customers, and transactions with BAWAG. In summary, these year-end transactions were carried out in the following approximate amounts and with the following parties during the 2000 to May 2004 period:

| Date | Approximate Customer Loans | BAWAG Loans | Approximate Total Loan Amount |
|---|---|---|---|
| Feb. 2000 | $310 million | $300 million | $610 million |
| Feb. 2001 | $450 million | $300 million | $750 million |
| Feb. 2002 | $625 million | $300 million | $925 million |
| Feb. 2003 | $650 million | $250 million | $900 million |

| Feb. 2004 | $720 million | $250 million | $970 million |
| May 2004 | $700 Million | $0 | $700 million |

24.    These transactions typically followed standard patterns.  For example, in or about February 2000, SANTO C. MAGGIO, Phillip R. Bennett and others caused the following transactions to occur with several customers and BAWAG, for the purpose of paying down a portion of the RGHI receivable over the February 2000 year-end:

a.    Three different customers (collectively, the "Three Customers") lent a total of approximately $310 million to RGHI, which it then used to pay down its obligation to Refco.  At the same time, Refco lent to the Three Customers $310 million. As a result, it appeared on Refco's books and records that Refco had $310 million in receivables from the Three Customers, and the debt from RGHI appeared to be reduced by $310 million.  In or about March 2000, the transactions were reversed, with Refco lending $310 million back to RGHI (thus increasing the amount owed by RGHI to Refco by $310 million), which RGHI then used to pay back the Three Customers the full amount of the loan.  To ensure a profit for the Three Customers, the interest rate that RGHI paid to the Three Customers was higher than the interest rate that the Three Customers paid to Refco.  Each of the transactions with the customers were memorialized in loan agreements between Refco, RGHI and the Three Customers, similar

to the agreements that follow:

(i).     On or about February 25, 2000,
Refco Capital Markets, Ltd. a Bermuda corporation controlled by
Refco, loaned Customer 2, one of the Three Customers,
approximately $150 million.  The loan was to be repaid on March
9, 2000.

(ii).     On or about the same day, February
25, 2000, Customer 2 loaned approximately $150 million to RGHI.
The repayment date was on or about March 9, 2000.  The loan
agreement for this loan was executed by Bennett on behalf of
RGHI.  The interest rate on this loan was 15 basis points higher
than the interest rate on the loan from Refco Capital Markets to
Customer 2, thereby assuring Customer 2 a profit.

(iii).     On or about the same date, Bennett
signed a letter of guaranty to Customer 2 on behalf of Refco
Group, Ltd., assuring Customer 2 that, should RGHI default on its
approximately $150 million obligation to Customer 2, Refco Group,
Ltd. would make Customer 2 whole.

b.   At or around the same time as the
transactions with the Three Customers, BAWAG loaned RGHI $300
million in cash.  RGHI then used the $300 million to pay off $300
million of its debt to Refco, and Refco then loaned to BAWAG $225
million, using the remaining $75 million to fund its operations.
In or about March 2000, the transaction was reversed.  Refco lent

$300 million to RGHI, thus recreating a $300 million debt to Refco from RGHI.  RGHI then used the $300 million to pay off the loan from BAWAG.

25.  In addition to the year-end transactions described above, which were designed to hide from Refco's auditors and investors the losses and other components of the RGHI receivable, Phillip R. Bennett, SANTO C. MAGGIO and others, consistently lied and caused others to lie to Refco's auditors in an effort to cover up the size of those losses and other expenses contained in the RGHI receivable.

### Refco Sells Notes Based On False Financial Information

26.  At various times prior to August 2004, Phillip R. Bennett, SANTO C. MAGGIO, and others, in furtherance of the scheme to defraud Refco's potential investors, caused Refco to raise capital through the private placement of certain notes. These notes were sold to investors based, in part, on the audited financial statements prepared by Refco's auditors, which in turn were rendered false and misleading by the year-end cover-up transactions outlined above and the siphoning of Refco expenses out of Refco and into RGHI.  In particular, Bennett, MAGGIO and others caused Refco to raise the following capital through the sale of the following notes to investors, based on false and fraudulent financial statements:

14

| Date | Note Coupon And Due Date | Approximate Capital Raised |
|---|---|---|
| November 30, 1999 | Series C 8.85% Maturing on November 30, 2007 | $56 million |
| June 29, 2000 | Series D 9.18% Maturing on June 29, 2005 | $37 million |
| October 15, 2002 | Series E 5.9% Maturing on October 15, 2007 | $100 million |
| October 15, 2002 | Series F 6.6% Maturing on October 25, 2009 | $122.5 million |

### Refco Obtains Credit Counterparty Relationships Based On False Financial Information

27.  Because Refco was constantly in need of cash to cover its transactions and meet settlement, Refco sought and obtained credit from banks and other financial institutions, including a revolving line of credit from a number of financial institutions, including JP Morgan Chase, beginning in or about 1998, that eventually grew to more than $300 million.  For each such transaction, including the annual renewal of the revolving line of credit, Refco submitted to the proposed creditor the fraudulent financial statements and made other false statements which materially misstated the health of Refco.

### Refco Helps BAWAG Hide Its Own Balance Sheet Problems

28.  Between 2000 and 2005, while BAWAG assisted Phillip R. Bennett in hiding the RGHI receivable in the manner described above, Bennett and SANTO C. MAGGIO caused Refco to assist BAWAG in hiding its own balance sheet problems.  In or

15

about early 2000, BAWAG entrusted approximately €350 million of BAWAG's funds to an investment advisor, who by the end of 2000 reported to the bank that he had lost substantially all of those funds.  In order to disguise this loss on its balance sheet, BAWAG arranged through Bennett and MAGGIO to hold in an account at Refco certain worthless bonds and other investments that Refco, at Bennett and MAGGIO's direction, maintained at a false value that, over time, reached at least approximately €500 million.  These fake assets were purportedly housed at Refco and maintained at an inflated value for BAWAG's benefit until 2005.

### Bennett's "Exit Strategy" Develops

29.  In or about 2003, Phillip R. Bennett caused Refco to hire an investment bank (the "Investment Bank"), to assist in selling Refco.  Bennett asked the Investment Bank to find a major investment bank or commercial bank to purchase Refco, but no such buyer was found to be interested.  After efforts to sell Refco to such a first line buyer failed, Bennett directed the Investment Bank to look for other purchasers for the company, with the understanding that it would be taken public.

30.  In connection with Phillip R. Bennett's plan to sell Refco, Bennett, SANTO C. MAGGIO, and others (a) continued to siphon Refco expenses and losses into RGHI, and (b) padded Refco's reported revenue in order to hit budgeted income targets set by Bennett and others to disguise the ongoing operational

problems at the company.

### The Fraudulent Leveraged Buyout Transaction

31.    In or about 2003, Phillip R. Bennett, SANTO C. MAGGIO, and others began negotiations with Thomas H. Lee Partners, a private equity fund, regarding that entity's possible purchase of a controlling stake in Refco as part of a leveraged buyout transaction.  As ultimately carried out on or about August 5, 2004, the leveraged buyout was structured as follows:  Thomas H. Lee Partners, through an affiliate, purchased a 57 percent ownership interest in Refco, in return for approximately $507 million of new capital; simultaneously, Refco sold $600 million in notes and obtained $800 million in financing from a syndicate of banks.

#### *Lies To Thomas H. Lee Partners*

32.    In connection with the leveraged buyout transaction, Phillip R. Bennett, SANTO C. MAGGIO, and others caused Refco's audited financial statements for the year ending February 2004 to be provided to Thomas H. Lee Partners.  Those audited financial statements were false and misleading in the following respects, among others:

a.    The financial statements hid the size of the related party receivable from RGHI, which at the end of February 2004 was, but for the cover-up loan transactions, at least approximately $1 billion, whereas the financial statements

misleadingly reported that the "$105 million due from related parties, included in loans receivable at February 28, 2003, was received by February 29, 2004."

b.    The financial statements falsely reported Refco's net income for the year as $187 million, when in fact that number was inflated.

33.    In connection with the leveraged buyout transaction, Phillip R. Bennett, SANTO C. MAGGIO, and others falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to RGHI for the purpose of hiding them.

**_Lies To The Note Purchasers_**

34.    In connection with the leveraged buyout transaction, Phillip R. Bennett, SANTO C. MAGGIO, and others provided to the note underwriters and note purchasers the following false and misleading information:

a.    Refco's audited financial statements for the year ended February 29, 2004, containing the same false and misleading statements described above in paragraph 32;

b.    Bennett, MAGGIO and others falsely represented that Refco did not suffer significant historical customer losses, and specifically denied that Refco incurred a significant loss from the collapse of the Asian markets which, in

18

fact, caused the Asian Debt Crisis Customer Losses; and

c.    Bennett, MAGGIO, and others falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to RGHI for the purpose of hiding them.

### Lies To The Bank Syndicate

35.    In connection with the leveraged buyout transaction, Phillip R. Bennett, SANTO C. MAGGIO, and others provided to the bank syndicate that was raising the $800 million in loans for Refco as part of the leveraged buyout transaction the following false and misleading information:

a.    Refco's audited financial statements for the year ended February 29, 2004, containing the same false and misleading statements described above in paragraph 32;

b.    Bennett, MAGGIO and others falsely represented that Refco did not suffer significant historical customer losses, and specifically denied that Refco incurred a significant loss from the collapse of the Asian markets which, in fact, caused the Asian Debt Crisis Customer Losses; and

c.    Bennett, MAGGIO, and others falsely stated that Refco did not engage in proprietary trading, when in fact, as they well knew, it did, had incurred substantial losses through that trading, and had transferred some of those losses to

RGHI for the purpose of hiding them.

36. The leveraged buyout transaction closed on or about August 5, 2004, and Refco received a total of approximately $1.9 billion. Thereafter, Phillip R. Bennett caused the distribution of funds, which had been wired into RGHI bank account at JP Morgan Chase in New York, New York, directly or indirectly, to the following persons and entities, among others:

| Recipient | Approximate Amount |
|---|---|
| BAWAG | $842 million |
| Refco (used to pay down RGHI receivable) | $306 million |
| Bennett | $25 million |
| Trosten | $48 million |
| Grant | $16 million |
| Other Former Equity Partners | $81.5 million |
| MAGGIO | $5.75 million |
| Other Refco Officers, Employees, and Affiliated Parties | $106.25 million |

## Bennett Plans To Take Refco Public

37. After the leveraged buyout, Phillip R. Bennett, who remained the Chief Executive Officer of Refco following the transaction, SANTO C. MAGGIO, and others plotted to sell a portion of Refco to the public through an Initial Public Offering ("IPO") of stock in Refco.

38. Between the August 2004 leveraged buyout and the August 2005 IPO, Phillip R. Bennett, SANTO C. MAGGIO, and others

continued their manipulation of Refco's finances:  At each
quarter and year-end period, Bennett and MAGGIO caused cover-up
loan transactions designed to hide the existence and size of the
RGHI receivable from Refco's auditors and investors; and Bennett
and MAGGIO continued to cause Refco expenses to be assumed by
RGHI and to artificially pad Refco's revenues by the means
previously described.  Bennett and MAGGIO caused the following
quarter- and year-end transactions:

| Date | Approximate Customer Loans | Bawag Loans | Approximate Total Loan Amount |
|---|---|---|---|
| August 2004 | $485 million | 0 | $485 million |
| November 2004 | $545 million | 0 | $545 million |
| February 2005 | $345 million | $250 million | $595 million |
| May 2005 | $450 million | 0 | $450 million |

39.  Between August 2004 and August 2005, Refco padded
its revenue by at least approximately $79 million, comprised of
at least approximately $38 million in inflated interest income,
at least approximately $13 million in fictitious transactions in
U.S. Treasury securities, and at least approximately $28 million
in fictitious foreign currency transactions.  In particular,
Bennett and MAGGIO caused the following transactions, among
others, to artificially inflate Refco's revenues:

a.   On or about February 11, 2005, Bennett and

MAGGIO caused Refco to credit a $12 million "interest adjustment" from RGHI that increased Refco's revenue by $12 million, and RGHI's debt to Refco by the same amount.

      b.   On or about February 17, 2005, Bennett and MAGGIO caused RGHI to engage in approximately 32 fictitious foreign currency exchange transactions in British Pounds, Euros, Japanese Yen and Swiss Francs with Refco.  RGHI lost approximately $5 million on the transactions, and Refco recognized $5 million in revenue as a result of the transactions. The $5 million loss was then added to the RGHI receivable.

### Refco's Public Filings And Publicly Traded Securities

      40.  In 2005, Refco registered certain of its securities with the SEC and, with that registration, was required to make certain additional public filings with the SEC.

      41.  On or about April 6, 2005, Refco filed an S-4 registration statement with the SEC in connection with its offer to exchange $600 million of the senior subordinated notes originally issued in August 2004 for $600 million of senior subordinated notes registered under the Securities Act of 1933. Phillip R. Bennett signed the registration statement on or about April 6, 2005 in New York, New York.  Registration of these notes permitted them to be traded publicly.  The S-4 contained several material misstatements about Refco, including the audited financial statements which failed to reflect the related party

transactions described above or the debt owed to Refco from RGHI. The S-4 also cited inflated revenue and income numbers that resulted from the revenue padding and expense shifting described above, and falsely claimed that Refco did not engage in proprietary trading.

42.    On or about July 19, 2005, as required by the Securities and Exchange Act of 1934 (the "Exchange Act") and applicable rules, Refco filed with the SEC its annual report for the year ended February 28, 2005 on Form 10K.  Phillip R. Bennett signed the annual report on or about July 19, 2005, in New York, New York.  Bennett also signed two certifications regarding the annual report.  In those certifications, Bennett attested that he had reviewed the annual report and (a) that it did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by th[e] report"; and (b) that "the information contained in the Report fairly present[ed], in all material respects, the financial condition and results of operations of the Company."  As noted above, the financial statements were fraudulent in that, among other things, they failed to reflect the related party receivables, the padded revenue, and the shifted expenses.

43.    On or about August 8, 2005, Refco filed an S-1

registration statement with the SEC in connection with its initial public offering of common stock.   Phillip R. Bennett signed that registration statement on or about August 8, 2005, in New York, New York.

44.   The S-4 registration statement, 10K annual report, and S-1 registration statement signed by Phillip R. Bennett each required the disclosure of (a) certain transactions between Refco and its management and (b) certain debts owed directly or indirectly by any executive officer of Refco to Refco, during Refco's past fiscal year and, for the registration statements, during Refco's prior two fiscal years.   These disclosures were required in order to apprize investors of, among other things, potential conflicts of interest by management.

45.   The S-4 registration statement, 10K annual report, and S-1 registration statement signed by Phillip R. Bennett each failed to disclose the related party transactions and the related party indebtedness between Refco and RGHI outlined above.   In particular, these public filings failed to disclose: (a) the existence of hundreds of millions of dollars of indebtedness by RGHI to Refco during 2004 and 2005; (b) the transactions at quarter- and fiscal year-end during 2004 and 2005 by which RGHI temporarily paid down its debt to Refco, the guaranties by Refco of the third party lenders' loans to RGHI, and the subsequent re-assumption of the debt by RGHI, each of which was a related party

transaction required to be disclosed in the public filings.

### Refco's August 2005 IPO

46.  On or about August 10, 2005, in reliance on, among other things, Refco's public filings and the accompanying audited financial statements, the public bought approximately $583 million of Refco's common stock.  Phillip R. Bennett, through RGHI, sold Refco stock in the IPO valued at more than $100 million, while retaining a substantial ownership interest in Refco.  Following the initial public offering, Refco's common stock was listed on the New York Stock Exchange under the ticker symbol "RFX."

### End Of Quarter Transactions In August 2005

47.  In or about late August 2005, after the completion of Refco's IPO, Phillip R. Bennett and SANTO C. MAGGIO caused Refco to carry out $420 million in cover-up transactions with a Refco customer that temporarily transformed all or part of the RGHI receivable into a receivable from that customer.  After the August 31, 2005 end of Refco's second quarter, the $420 million in cover-up transactions were reversed.

### Public Disclosure Of The Related Party Debt

48.  In or about early October 2005, Refco discovered an approximately $430 million receivable on its books from RGHI. It demanded repayment of the debt by Phillip R. Bennett, who repaid Refco approximately $430 million on or about October 10,

2005, having received an emergency loan in that approximate amount from BAWAG.

49. On or about October 10, 2005, Refco issued a press release announcing the following:

> [Refco] discovered through an internal review a receivable owed to the Company by an entity controlled by Phillip R. Bennett, Chief Executive Officer and Chairman of the Board of Directors, in the amount of approximately $430 million. Mr. Bennett today repaid the receivable in cash, including all accrued interest. Based on the results of the review to date, the Company believes that the receivable was the result of the assumption by an entity controlled by Mr. Bennett of certain historical obligations owed by unrelated third parties to the Company, which may have been uncollectible. The Company believes that all customer funds on deposit are unaffected by these activities. Independent counsel and forensic auditors have been retained to assist the Audit Committee in an investigation of these matters.

50. Following Refco's announcement, the market price of Refco stock plummeted, resulting in a loss of well more than $1 billion in market capitalization.

51. On or about October 17, 2005, Refco, Inc. and twenty-three of its subsidiaries or affiliates filed a petition in bankruptcy in the United States Bankruptcy Court for the Southern District of New York. Refco's common stock was subsequently delisted by the New York Stock Exchange.

### THE CONSPIRACY

52. From in or about the mid-1990s up to in or about October 2005, in the Southern District of New York and elsewhere,

SANTO C. MAGGIO, the defendant, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, namely:  (a) to commit fraud in connection with the purchase and sale of securities issued by Refco, in violation of Sections 78j(b) and 78ff of Title 15, United States Code, and Section 240.10b-5 of Title 17, Code of Federal Regulations; (b) to make and cause to be made false and misleading statements of material fact in reports and documents required to be filed with the SEC under the Securities Exchange Act of 1934 (the "Exchange Act"), and the rules and regulations promulgated thereunder, in violation of Title 15, United States Code, Sections 78o(d) and 78ff; (c) to make and cause to be made false statements in a registration statement filed under the Securities Act, in violation of Title 15, United States Code, Section 77x; (d) to commit wire fraud, in violation of Section 1343 of Title 18, United States Code; (e) to make and cause to be made false statements and omissions to Refco's auditors, in violation of Title 15, United States Code, Sections 78m and 78ff, and Title 17, Code of Federal Regulations, Section 240.13b2-2; (f) to commit bank fraud, in violation of Section 1344 of Title 18, United States Code; and (g) to commit money laundering, in violation of Section 1957(a) of Title 18, United States Code.

## OBJECTS OF THE CONSPIRACY

### Securities Fraud

53.    It was a part and object of the conspiracy that
SANTO C. MAGGIO, the defendant, and others known and unknown,
unlawfully, willfully, and knowingly, by the use of the means and
instrumentalities of interstate commerce, the mails, and
facilities of national securities exchanges, directly and
indirectly, would and did use and employ, in connection with the
purchase and sale of securities, manipulative and deceptive
devices and contrivances, in violation of Title 17, Code of
Federal Regulations, Section 240.10b-5, by: (a) employing
devices, schemes, and artifices to defraud; (b) making untrue
statements of material facts and omitting to state material facts
necessary in order to make the statements made, in the light of
the circumstances under which they were made, not misleading; and
(c) engaging in acts, practices, and courses of business which
operated and would operate as a fraud and deceit upon a person,
in connection with the purchase and sale of notes issued by Refco
and the common stock of Refco, Inc., all in violation of Title
15, United States Code, Sections 78j(b) and 78ff.

### False Statements In SEC Filings — Exchange Act

54.    It was further a part and object of the conspiracy
that SANTO C. MAGGIO, the defendant, and others known and
unknown, unlawfully, willfully, and knowingly, in reports and

documents required to be filed with the SEC under the Exchange Act, and the rules and regulations promulgated thereunder, would and did make and cause to be made statements which were false and misleading with respect to material facts, in violation of Title 15, United States Code, Sections 78o(d) and 78ff.

## False Statements In SEC Filings – Securities Act

55. It was further a part and object of the conspiracy that SANTO C. MAGGIO, the defendant, and others known and unknown, unlawfully, willfully, and knowingly would and did make and cause to be made, in a registration statement filed with the SEC under the Securities Act of 1933, untrue statements of material facts and omissions to state material facts required to be stated therein and necessary to make the statements therein not misleading, in violation of Title 15, United States Code, Section 77x.

## Wire Fraud

56. It was further a part and object of the conspiracy that SANTO C. MAGGIO, the defendant, and others known and unknown, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals,

pictures, and sounds for the purpose of executing such scheme and artifice, all in violation of Title 18, United States Code, Section 1343.

## Material Misstatements To Auditors

57.   It was further a part and object of the conspiracy that SANTO C. MAGGIO, the defendant, and Phillip R. Bennett, an officer and director of Refco, an issuer obligated to file reports pursuant to section 15(d) of the Exchange Act of 1934 and with a class of securities registered pursuant to section 12 of the Exchange Act, unlawfully, willfully and knowingly, directly and indirectly, (a) made and caused to be made materially false and misleading statements; and (b) omitted to state, and caused others to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading to accountants in connection with (i) audits, reviews and examinations of the financial statements of Refco required to be filed under the Exchange Act; and (ii) the preparation and filing of documents and reports required to be filed with the SEC pursuant to rules and regulations promulgated by the SEC, in violation of Title 15, United States Code, Section 78m, and Title 17, Code of Federal Regulations, Section 240.13b2-2(a).

## Bank Fraud

58.   It was further a part and object of the conspiracy

30

that SANTO C. MAGGIO, the defendant, and others known and unknown, unlawfully, willfully and knowingly, would and did execute, and attempt to execute, a scheme and artifice to defraud a financial institution, to wit, HSBC, and to obtain moneys, funds, credits, assets, securities and other property owned by, and under the custody and control of, a financial institution whose deposits were insured by the Federal Deposit Insurance Corporation, by means of false and fraudulent pretenses, representations and promises, all in violation of Title 18, United States Code, Section 1344.

### Money Laundering

59. It was further a part and object of the conspiracy that SANTO C. MAGGIO, the defendant, and others known and unknown, in an offense involving and affecting interstate and foreign commerce, unlawfully, willfully and knowingly would and did engage and attempt to engage in monetary transactions in criminally derived property that was of a value greater than $10,000 and that was derived from specified unlawful activity, to wit, securities fraud, bank fraud, and wire fraud, in violation of Title 18, United States Code, Section 1957(a).

### MEANS AND METHODS OF THE CONSPIRACY

60. Among the means and methods by which SANTO C. MAGGIO, the defendant, and others known and unknown, and their co-conspirators would and did carry out the conspiracy were the

following:

        a.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators misrepresented to the public the size of customer losses for which Refco was responsible.

        b.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators transferred losses incurred by Refco to Bennett's company, RGHI.

        c.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators concealed the size and related party nature of the debt owed by RGHI to Refco by causing Refco and others to carry out loan transactions over fiscal year-end and fiscal quarter-end dates to move the RGHI receivable to one or more Refco customers.

        d.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators caused Refco to file false and fraudulent statements with the SEC.

        e.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators made and caused to be made material false statements and omissions to Refco's auditors.

        f.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators used facilities of interstate commerce, including the use of interstate telephone calls and interstate wire transfers, in furtherance of the objects of the conspiracy.

g.    SANTO C. MAGGIO, the defendant, and Phillip R. Bennett and their coconspirators misrepresented to customers, potential customers, lenders, investors and others that Refco did not engage in proprietary trading.

**Overt Acts**

61.    In furtherance of the conspiracy and to effect the illegal objects thereof, the following acts, among others, were committed in the Southern District of New York and elsewhere:

a.    In or about late 1997, Phillip R. Bennett and Tone N. Grant misrepresented to the public that Refco had not taken a significant loss in connection with the trading of Customer 1.

b.    On or about May 15, 1998, Phillip R. Bennett and Tone N. Grant signed a letter to Refco's auditors misrepresenting, among other things, that "the accounting records underlying the financial statements accurately and fairly reflect, in reasonable detail, the transactions of the company" and that Refco had properly "recorded or disclosed" all "related party transactions and related amounts receivable or payable."

c.    On or about April 30, 2003, Phillip R. Bennett and Robert C. Trosten signed a letter to Refco's auditors representing, among other things, that all related party transactions and related party amounts receivable had been fully disclosed to the auditors.

33

d.    On or about February 20, 2004, in New York, New York, SANTO C. MAGGIO signed a loan agreement on behalf of Refco Capital Markets, Ltd., regarding an approximately $720 million loan from Refco Capital Markets, Ltd., to a customer.

e.    On or about April 27, 2004, Phillip R. Bennett and Robert C. Trosten signed a letter to Refco's auditors representing, among other things, that all related party transactions and related party receivables had been fully disclosed to the auditors.

f.    On or about May 17, 2004, Phillip R. Bennett and Tone N. Grant met at a hotel in lower Manhattan to discuss the more than $1 billion debt that they, as the owners of RGHI, owed to Refco.

g.    On or about August 5, 2004, Phillip R. Bennett caused RGHI to transfer to Robert C. Trosten approximately $48 million.

h.    On or about August 5, 2004, Phillip R. Bennett caused RGHI to transfer to Tone N. Grant approximately $4 million.

i.    On or about August 5, 2004, Phillip R. Bennett caused RGHI to transfer to SANTO C. MAGGIO, the defendant, approximately $5.75 million.

j.    On or about August 8, 2004, Phillip R. Bennett caused RGHI to transfer to TONE N. GRANT approximately

$12 million.

        k.   On or about February 23, 2005, in New York, New York, Phillip R. Bennett signed a guaranty letter on behalf of Refco Group Ltd., regarding an approximately $345 million loan from a Refco customer to RGHI.

        l.   On or about April 6, 2005, in New York, New York, Phillip R. Bennett signed Refco's S-4 registration statement.

        m.   On or about May 25, 2005, in New York, New York, Phillip R. Bennett signed a guaranty letter on behalf of Refco Group Ltd., regarding an approximately $450 million loan from a Refco customer to RGHI.

        n.   On or about July 19, 2005, in New York, New York, Phillip R. Bennett signed Refco's annual report on Form 10K.

        o.   On or about August 8, 2005, in New York, New York, Phillip R. Bennett signed Refco's S-1 registration statement.

        p.   On or about August 26, 2005, in New York, New York, SANTO C. MAGGIO signed a loan agreement on behalf of Refco Capital Markets, Ltd., regarding an approximately $420 million loan from Refco Capital Markets, Ltd., to a customer.

        q.   On or about September 6, 2005, Phillip R. Bennett caused RGHI to transfer to SANTO C. MAGGIO, the

defendant, approximately $7,668,600.

(Title 18, United States Code, Section 371).

## COUNT TWO

### (Securities Fraud)

The United States Attorney further charges:

62.  The allegations contained in paragraphs 1 through 51, 60 and 61 of this Information are repeated and realleged as if fully set forth herein.

63.  From in or about the late 1990s up to in or about 2004, in the Southern District of New York and elsewhere, SANTO C. MAGGIO, the defendant, unlawfully, willfully, and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons and entities, in connection with the purchase and

sale of 9% Senior Subordinated Notes due 2012, issued by Refco

Group Ltd., LLC and Refco Finance, Inc.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title
17, Code of Federal Regulations, Section 240.10b-5; and
Title 18, United States Code, Section 2.)

## COUNT THREE

### (Securities Fraud)

The United States Attorney further charges:

64.  The allegations contained in paragraphs 1 through

51, 60 and 61 of this Information are repeated and realleged as

if fully set forth herein.

65.  From in or about the late 1990s up to in or about

October 2005, in the Southern District of New York and elsewhere,

SANTO C. MAGGIO, the defendant, unlawfully, willfully, and

knowingly, directly and indirectly, by the use of means and

instrumentalities of interstate commerce, the mails, and the

facilities of national securities exchanges, did use and employ,

in connection with the purchase and sale of securities,

manipulative and deceptive devices and contrivances, in violation

of Title 17, Code of Federal Regulations, Section 240.10b-5, by:

(a) employing devices, schemes, and artifices to defraud; (b)

making untrue statements of material facts and omitting to state

material facts necessary in order to make the statements made, in

light of the circumstances under which they were made, not

misleading; and (c) engaging in acts, practices, and courses of

37

business which operated and would operate as a fraud and deceit upon a person, in connection with the purchase and sale of the common stock of Refco, Inc.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2).

## COUNT FOUR

### (Wire Fraud)

The United States Attorney further charges:

66. The allegations contained in paragraphs 1 through 51, 60 and 61 of this Information are repeated and realleged as if fully set forth herein.

67. On or about July 19, 2005, in the Southern District of New York, SANTO C. MAGGIO, the defendant, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, the following writings, signs, signals, and sounds for the purpose of executing such scheme and artifice, the electronic transmission of Refco Form 10-K from New York, New York to Virginia.

(Title 18, United States Code, Sections 1343 and 2).

## FORFEITURE ALLEGATION WITH RESPECT TO
## COUNTS ONE THROUGH FOUR

68.  As a result of committing one or more of the foregoing securities fraud offenses, in violation of Title 15, United States Code, Sections 78j(b) and 78ff; and Title 17, Code of Federal Regulations, Sections 240.10b-5, as alleged in Counts One, Two and Three; and wire fraud offenses, in violation of Title 18, United States Code, Section 1343, as alleged in Counts One and Four of this Information, SANTO C. MAGGIO shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the securities and wire fraud offenses, including but not limited to the following: At least $2.4 billion in United States currency, representing the amount of proceeds obtained as a result of the charged wire and securities fraud offenses, for which the defendant is jointly and severally liable.

## SUBSTITUTE ASSETS PROVISION

69.  If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(i)  cannot be located upon the exercise of due diligence;

(ii)  has been transferred or sold to, or deposited with, a third party;

39

     (iii) has been placed beyond the jurisdiction of the court;

     (iv) has been substantially diminished in value; or

     (v) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982 and Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendants up to the value of the forfeitable property described above.

 (Title 18, United States Code, Sections 371, 981, 982, 1343;
Title 15, United States Code, Sections 78j(b), 78ff; Title 17,
Code of Federal Regulations, Sections 240.10b-5; Title 21, United
States, Section 853(p); and Title 28, United States Code, Section
2461.)

_____
MICHAEL J. GARCIA
United States Attorney

40

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v -

### SANTO C. MAGGIO,

**Defendant.**

### INFORMATION

07 Cr.

(18  USC §371; 15 USC §§ 78j(b) and 78ff; 17 CFR §
240.10b-5,18 USC § 2; 15 USC § 78o(d) and 78ff, 17 CFR,
§240.15d-2; 18 USC §2; 15 USC , §77x, 18 USC §2; 18
USC 1343, 2; 15 U.S.C. §78m and 78ff;  17 CFR §240.13b2-
2); 18 USC 1344,2: 18 USC 1957(a).

MICHAEL J. GARCIA
United States Attorney.